**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| AMERICANS FOR PROSPERITY FOUNDATION | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Civil Action No. 21-2021 (CJN) |
| CENTERS FOR MEDICARE AND MEDICAID SERVICES, | ) ) ) | |
| *Defendant.* | ) ) ) | |

---

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Ryan P. Mulvey
D.C. Bar No. 1024362
Eric R. Bolinder
D.C. Bar No. 1028335

AMERICANS FOR PROSPERITY
FOUNDATION
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Telephone: (571) 444-2841
rmulvey@afphq.org
ebolinder@afphq.org

*Counsel for Plaintiff*

# TABLE OF CONTENTS

Table of Authorities .................................................................................................... iii

Introduction ................................................................................................................ 1

Factual and Procedural Background ........................................................................... 1

Standard of Review ..................................................................................................... 3

Argument .................................................................................................................... 4

I.   The FOIA's foreseeable-harm standard imposes an additional and meaningful
     burden on an agency to justify non-disclosure of an exempt record. ................. 5

II.  With the attorney-client privilege, an agency must show real and foreseeable harm
     unique from its satisfaction of the technical prerequisites for use of the privilege. .......... 8

     A.   An agency's claim of "self-evident" harm, absent more detailed
          analysis, cannot satisfy the foreseeable-harm standard. ........................... 9

     B.   CMS's arguments in support of "self-evident" harm are unavailing...................... 11

     C.   The caselaw cited by CMS is inapt or distinguishable. ........................... 16

III. CMS has not satisfied its burden under the foreseeable-harm standard
     to withhold the record at issue. ....................................................................... 20

IV.  The Court should consider conducting *in camera* review. ............................... 23

Conclusion ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Civil Liberties Union v. Central Intelligence Agency*,
No. 18-2784, 2022 WL 306360 (D.D.C. Feb. 2, 2022) ....................................................18, 24

*American Small Business League v. Department of Defense*,
411 F. Supp. 3d 824 (N.D. Cal. 2019) ...................................................................................11

*Avila v. Department of State*,
No. 17-2685, 2022 WL 2104483 (D.D.C. June 10, 2022) .......................................................18

*Black Hills Clean Water Alliance v. U.S. Forest Service*,
No. 20-5034, 2022 WL 2340440 (D.S.D. June 29, 2022) .........................................6, 9, 21, 22

*Building & Construction Trades Department, AFL-CIO v. Allbaugh*,
172 F. Supp. 2d 138 (D.D.C. 2001) .......................................................................................17

*Cabezas v. Federal Bureau of Investigation*,
No. 19-0145, 2022 WL 898789 (D.D.C. Mar. 28, 2022) .......................................................18

*Carter v. Department of Commerce*,
830 F.2d 388 (D.C. Cir. 1987) ..............................................................................................24

*Cayuga Nation v. Department of the Interior*,
No. 20-2642, 2022 WL 888178 (D.D.C. Mar. 25, 2022) .................................................18, 24

*Center for Investigative Reporting v. Department of Labor*,
424 F. Supp. 3d 771 (N.D. Cal. 2019) ...................................................................................11

*Center for Investigative Reporting v. U.S. Customs & Border Protection*,
436 F. Supp. 3d 90 (D.D.C. 2019) .................................................................................. *passim*

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ...............................................................................................................13

*Coastal States Gas Corp. v. Department of Energy*,
617 F.2d 854 (D.C. Cir. 1980) ................................................................................................9

*Corley v. United States*,
556 U.S. 303 (2009) .................................................................................................................7

*Defenders of Wildlife v. U.S. Border Patrol*,
623 F. Supp. 2d 83 (D.D.C. 2009) ..........................................................................................4

*Department of the Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1 (2001) .....................................................................................................................5

*Ecological Rights Foundation v. Environmental Protection Agency*,
    No. 19-0980, 2021 WL 535725 (D.D.C. Feb. 13, 2021) .......................................................17

*Environmental Protection Agency v. Mink*,
    410 U.S. 74 (1973) ....................................................................................................13, 14

*Federal Trade Commission v. Grolier, Inc.*,
    462 U.S. 19 (1983) ..............................................................................................................14

*Food Marketing Institute v. Argus Leader Media*,
    139 S. Ct. 2356 (2019) ........................................................................................................11

*General Accounting Office v.*
*General Accounting Office Personnel Appeals Board*,
    698 F.2d 516 (D.C. Cir. 1983) ...........................................................................................16

*Houston Lighting & Power Co. v. United States*,
    606 F.2d 1131 (D.C. Cir. 1979) .........................................................................................16

*Huffman v. Western Nuclear, Inc.*,
    486 U.S. 663 (1988) ..............................................................................................................4

*Ibrahim v. Department of State*,
    311 F. Supp. 3d 134 (D.D.C. 2018) .....................................................................................7

*Jewish War Veterans of the United States, Inc. v. Mattis*,
    266 F. Supp. 3d 248 (D.C. Cir. 2017) ................................................................................17

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989) ..............................................................................................................3

*Judicial Watch, Inc. v. Department of Commerce*,
    375 F. Supp. 3d 93 (D.D.C. 2019) .......................................................................5, 7, 8, 12

*Keeping Government Beholden, Inc. v. Department of Justice*,
    No. 17-1569, 2021 WL 5918627 (D.D.C. Dec. 13, 2021) ....................................................8

*Lewis v. City of Chicago*,
    560 U.S. 205 (2010) ............................................................................................................13

*In re Lindsey*,
    148 F.3d 1100 (D.C. Cir. 1998) ...........................................................................................9

*Louise Trauma Center LLC v. Department of Homeland Security*,
    No. 20-1128, 2022 WL 1081097 (D.D.C. Apr. 4, 2022) ....................................................17

*Loving v. Department of Defense*,
    550 F.3d 32 (D.C. Cir. 2008) .............................................................................................23

iv

*Machado Amadis v. Department of State,*
 971 F.3d 364 (D.C. Cir. 2020) ........................................................4, 7, 12

*Mead Corp. v. Tilley,*
 490 U.S. 714 (1989) ..............................................................................15

*Mead Data Central, Inc. v. Department of the Air Force,*
 566 F.2d 242 (D.C. Cir. 1977) ................................................................9

*Military Audit Project v. Casey,*
 656 F.2d 724 (D.C. Cir. 1981) ................................................................4

*Multi Ag Media LLC v. Department of Agriculture,*
 515 F.3d 1224 (D.C. Cir. 2008) ..............................................................4

*National Archives & Records Administration v. Favish,*
 541 U.S. 157 (2004) ................................................................................3

*New York Times Co. v. Department of Justice,*
 756 F.3d 100 (2d. Cir. 2014) .................................................................12

*North v. Walsh,*
 881 F.2d 1088 (D.C. Cir. 1989) ............................................................13

*People for the American Way Foundation v. National Park Service,*
 503 F. Supp. 2d 284 (D.D.C. 2007) .......................................................24

*Quick v. Department of Commerce,*
 775 F. Supp. 2d 174 (D.D.C. 2011) .........................................................3

*Quiñon v. Federal Bureau of Investigation,*
 86 F.3d 1222 (D.C. Cir. 1996) ..............................................................24

*Reporters Committee for Freedom of the Press v.*
 *Customs & Border Protection,*
 567 F. Supp. 3d 97 (D.D.C. 2021) .....................................19, 20, 21, 22

*Reporters Committee for Freedom of the Press v.*
 *Federal Bureau of Investigation,*
 3 F.4th 350 (D.C. Cir. 2021) ....................................................7, 8, 15, 22

*Rosenberg v. Department of Defense,*
 342 F. Supp. 3d 62 (D.D.C. 2018) .........................................................21

*Rosenberg v. Department of Defense,*
 442 F. Supp. 3d 240 (D.D.C. 2020) ...................................................7, 10

*Schoenman v. Federal Bureau of Investigation*,
  575 F. Supp. 2d 136 (D.D.C. 2008) ........................................4

*Seife v. Food & Drug Administration*,
  43 F.4th 231 (2d Cir. 2022) .......................................11

*Selgjekaj v. Executive Office for U.S. Attorneys*,
  No. 20-2145, 2021 WL 3472437 (D.D.C. Aug. 6, 2021) .......................17

*Solid Waste Agency of Northern Cook County v.
  U.S. Army Corps of Engineers*,
  531 U.S. 159 (2001) .......................................16

*Spirko v. U.S. Postal Service*,
  147 F.3d 992 (D.C. Cir. 1998) .......................................23

*Tobias v. Department of the Interior*,
  No. 18-1368, 2021 WL 4262488 (D.D.C. Sep't 20, 2021) .......................19

*United States v. Jicarilla Apache Nation*,
  564 U.S. 162 (2011) .......................................20

*United States v. Sullivan*,
  116 F. Supp. 480 (D.C. Cir. 1953) .......................................17

*United States v. Weber Aircraft Corp.*,
  465 U.S. 792 (1985) .......................................14

*In re Witness Before Special Grand Jury 2000-2*,
  288 F.3d 289 (7th Cir. 2002) .......................................13

**Statutes**

5 U.S.C. § 552(a)(4)(B) .......................................4, 23

5 U.S.C. § 552(a)(8)(A)(i) .......................................4, 5, 15

5 U.S.C. § 552(b)(5) .......................................13, 15

42 U.S.C. § 1396b .......................................1

FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538 .......................................4

**Rules**

Federal Rule of Civil Procedure 56(a) .......................................4

**Legislative Materials**

162 Cong. Rec. S1496 (daily ed. Mar. 15, 2016) (statement of Sen. Leahy) ............................6, 16

H.R. Rep. No. 114-391 (2016) ...................................................................................................6, 15

S. Rep. No. 114-4 (2015) .......................................................................................................6, 9, 15

**Other Authorities**

Antonin Scalia & Bryan A. Garner,
   *Reading Law: The Interpretation of Legal Texts* (2012) ..........................................20

Department of Justice, Attorney General Memorandum for Executive
   Departments and Agencies Concerning the Freedom of Information Act,
   74 Fed. Reg. 51,879 (Oct. 8, 2009) ...............................................................................6

Department of Justice, OIP Guidance: Applying the "Foreseeable Harm" Standard
   Under Exemption 5, FOIA Update, vol. XV, no. 2 (Jan. 1, 1994) .........................9, 10, 14, 22

*High Risk Area: Medicare Program & Improper Payments*,
   Gov't Accountability Office, https://bit.ly/3A6n06B ...............................................2

Medicaid/CHIP Program; Medicaid Program and Children's Health Insurance
   Program (CHIP); Changes to the Medicaid Eligibility Quality Control and
   Payment Error Rate Measurement Programs in Response to the Affordable
   Care Act, 82 Fed. Reg. 31,158 (July 5, 2017) (to be codified at 42 C.F.R.
   pts. 431 & 457) ...............................................................................................................2

Second Supplemental Declaration of Vanna Blaine,
   *American Civil Liberties Union v. Central Intelligence Agency*,
   No. 18-2784 (D.D.C. filed Aug. 24, 2021), ECF No. 40-1 ......................................19

## INTRODUCTION

This Freedom of Information Act ("FOIA") case puts a straightforward question before the Court: Does the foreseeable-harm standard, in the context of the attorney-client privilege, require a particularized demonstration of harm that goes beyond rote recitation of the policy reasons for protecting attorney-client confidentiality?  Or may an agency merely rehearse the technical requirements for the privilege and its general purpose, thus effectively nullifying the new burden Congress imposed on agencies when it added the foreseeable-harm provision to the statute?

Plaintiff Americans for Prosperity Foundation ("AFPF") and Defendant Centers for Medicare and Medicaid Services ("CMS") have narrowed their dispute to the treatment of a single record, totaling seven pages with attachments, which is more than thirty years old.  That record reflects the solicitation and provision of legal review for a pair of draft documents concerning state Medicaid disallowance liabilities for Fiscal Year 1982.  The parties agree the record falls within the scope of the attorney-client privilege, but they disagree as to the nature of CMS's added burden to justify the partial withholding of the record under the foreseeable-harm standard.  On AFPF's view, the text of the FOIA, its legislative history, guidance published by the Department of Justice's Office of Information Policy ("OIP"), and the trend of caselaw point to a heightened showing that CMS has not met in this case.  AFPF therefore requests that the Court deny CMS's motion for summary judgment and grant AFPF's cross-motion for summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Section 1903(u) of the Social Security Act requires CMS to recover improper Medicaid payments greater than three percent.  *See* 42 U.S.C. § 1396b.  Evidence suggests that in recent years CMS has not been diligent in meeting its obligation to recover money improperly sent to states to reimburse the federal government for ineligible Medicaid expenses.  In July 2017, for

1

example, CMS published a rule stating it would only seek reimbursement if "a state's eligibility improper payment rate is above the 3 percent threshold for two consecutive [Payment Error Rate Measurement (PERM)] cycles" and the "state fails to demonstrate a good faith effort in reducing its eligibility improper payment rate." Medicaid/CHIP Program; Medicaid Program and Children's Health Insurance Program (CHIP); Changes to the Medicaid Eligibility Quality Control and Payment Error Rate Measurement Programs in Response to the Affordable Care Act, 82 Fed. Reg. 31,158, 31,162, 31,177 (July 5, 2017) (to be codified at 42 C.F.R. pts. 431 & 457). The Government Accountability Office, for its part, has highlighted the need for CMS to do more to conduct fraud risk assessments, create risk-based antifraud strategies for Medicaid programs, improve improper-payment monitoring, and seek legislative authority to permit auditors to conduct prepayment claims reviews. *See High Risk Area: Medicare Program & Improper Payments*, Gov't Accountability Office, https://bit.ly/3A6n06B (last visited Dec. 13, 2022).

To understand more about CMS's efforts to recover improper Medicaid payments, AFPF submitted a FOIA request seeking six categories of records. Pl.'s Statement of Undisputed Material Facts ¶ 1 [hereinafter "Pl.'s SUMF"]; Decl. of Ryan P. Mulvey Ex. 1; Compl. Ex. 3, ECF No. 1-3. AFPF filed this lawsuit after CMS failed to provide a timely final response to AFPF's request. Pl.'s SUMF ¶ 3. After answering the complaint, CMS conducted searches and produced records, and the parties negotiated solutions to most of the contested redactions. *See* Pl.'s SUMF ¶ 4. The parties eventually narrowed the scope of summary judgment to the treatment of a single record and, specifically, the precise question of the interaction between the foreseeable-harm standard with the attorney-client privilege. Pl.'s SUMF ¶¶ 5 & 29–30; *see* Pl.'s SUMF ¶ 6; *see also* Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. at 1 n.1 [hereinafter "Def.'s Br."], ECF No. 24-1.

The sole record in dispute is a seven-page memorandum, inclusive of attachments, dated September 18, 1990.  Pl.'s SUMF ¶ 6.[1]  That document reflects CMS's request for "review and clearance" of a separate memorandum and draft letter that "proposed giving states which are disallowance liable for fiscal year 1982 (FY 82) the opportunity to review quality control resource errors by using the lesser of the excess resource amount of the paid claims amount."  Pl.'s SUMF ¶¶ 9, 17, 20; *see generally* Pl.'s SUMF ¶¶ 8–21.  The September 1990 memorandum is more than thirty years old, Pl.'s SUMF ¶ 22, and the draft materials that CMS sent for legal review concern state-government disallowance liabilities for Fiscal Year 1982, which ended roughly forty years ago.  Pl.'s SUMF ¶¶ 23–24.  The memorandum is so old that CMS could not locate an employee who knew anything about the underlying deliberations or legal consultation.  Pl.'s SUMF ¶ 28.

## STANDARD OF REVIEW

"Congress enacted FOIA to introduce transparency into government activities."  *Quick v. Dep't of Commerce*, 775 F. Supp. 2d 174, 179 (D.D.C. 2011) (citation omitted).  The law serves as a "means for citizens to know what the Government is up to" and "defines a structural necessity in a real democracy."  *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (cleaned up and citation omitted).  The rights afforded under the statute are a bulwark to the "fundamental principle of public access" to records of the administrative state, which can often be "shielded unnecessarily from public view . . . [by] possibly unwilling official hands."  *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989) (cleaned up and citation omitted).

---

[1] Of the seven pages comprising the memorandum and its attachments, CMS released two pages in full (including one blank page), redacted in part three pages, and withheld in full two pages. Pl.'s SUMF ¶ 7.  CMS initially invoked the deliberative-process privilege, but it withdrew that privilege and asserted the attorney-client privilege after AFPF advised the agency that use of the deliberative-process privilege was statutorily barred by Exemption 5's "sunset" provision.  *See* Pl.'s SUMF ¶¶ 25–27; Mulvey Decl. ¶¶ 26–28.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). "[T]he burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B). The district court must determine de novo "whether the agency has sustained its burden of demonstrating that the documents requested . . . are exempt from disclosure." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (cleaned up and citation omitted). The district court must also determine whether the agency has shown how disclosure is "prohibited by law" or that it "reasonably foresees that disclosure would harm an interest protected by an exemption." 5 U.S.C. § 552(a)(8)(A)(i); *see, e.g.*, *Machado Amadis v. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020).

An agency meets its burden by proffering affidavits "describ[ing] the documents and the justifications for nondisclosure with reasonably specific detail" that is "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). The court analyzes all "underlying facts and inferences . . . in the light most favorable to the FOIA requester." *Schoenman v. Fed. Bureau of Investigation*, 575 F. Supp. 2d 136, 148 (D.D.C. 2008) (citation omitted). If both parties seek summary judgment, each motion must stand on its own. *Huffman v. W. Nuclear, Inc.*, 486 U.S. 663, 664 n.11 (1988).

## ARGUMENT

The only record at issue in this case is a memorandum that is more than thirty years old. The parties agree the memorandum falls within the scope of the attorney-client privilege. But clearing the Exemption 5 hurdle—and showing that the privilege applies—is only the first step in justifying a withholding. After passage of the FOIA Improvement Act of 2016, Pub. L. No. 114-

185, 130 Stat. 538, Congress now requires an agency to also show how it reasonably foresees disclosure would harm an interest protected by an exemption.

For this foreseeable-harm standard to mean anything, it must be rigorously applied to every case and with every exemption. Claiming abstract harm from the release of a record created more than three decades ago—a record that no one at the agency knows anything about—cannot meet that standard. Nor could it be enough for an agency to recite the policy reasons for a privilege applying in the first instance. CMS, for its part, insists its added burden, in the context of the attorney-client privilege, requires "little" effort because the harm is "self-evident." Def.'s Br. at 3. But this is wrong. The agency's position conflicts with the plain text of the FOIA, the relevant legislative history, long-standing OIP guidance, and other authorities. The foreseeable-harm standard must be taken seriously, and the evidentiary record here cannot justify withholding.

**I.    The FOIA's foreseeable-harm standard imposes an additional and meaningful burden on an agency to justify non-disclosure of an exempt record.**

The FOIA mandates an agency to release responsive records unless they fall under an enumerated statutory exemption. "These limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant object of the Act." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7–8 (2001) (cleaned up). With the FOIA Improvement Act of 2016 ("2016 FOIA Amendments"), however, Congress raised the bar for an agency to sustain its withholdings. An agency may now only "withhold information" if it "reasonable foresees that disclosure would harm an interest protected by an exemption" or if disclosure is otherwise "prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i).

Under the foreseeable-harm standard, is it not enough for an agency to make a case for the technical application of a statutory exemption or attendant privilege. *See Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 101 (D.D.C. 2019). It must articulate *precise* reasons

why disclosure of *specific* records would be reasonably foreseen to harm an interest protected by an exemption.  *See* 162 Cong. Rec. S1496 (daily ed. Mar. 15, 2016) (statement of Sen. Leahy) ("[C]odifying the presumption of openness will help reduce the perfunctory withholding of documents . . . .  It requires agencies to consider whether the release of particular documents will cause any foreseeable harm to an interest the applicable exemption is meant to protect.").  Congress did not codify existing policies or practices, nor did it anticipate "self-evident" harms.

Before enactment of the 2016 FOIA Amendments, agencies were afforded some discretion with implementing the "presumption of openness."  *See* Dep't of Justice, Attorney General Memorandum for Executive Departments and Agencies Concerning the Freedom of Information Act, 74 Fed. Reg. 51,879 (Oct. 8, 2009) ("An agency should not withhold records merely because it can demonstrate, as a technical matter, that the records fall within the scope of a FOIA exemption.").  Yet Congress has turned that "presumption" into a "permanent requirement" that would "prohibit agencies from" routine withholdings.  *See* H.R. Rep. No. 114-391 at 9 (2016); *id.* at 9 ("An inquiry into whether an agency has reasonably foreseen a specific, identifiable harm . . . require[s] the ability to articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld."); *see also* S. Rep. No. 114-4 at 8 (2015) ("Agencies should note that mere 'speculative or abstract fears,' or fear of embarrassment, are an insufficient basis for withholding information.").

To construe the foreseeable-harm standard in so loose a fashion as to admit "self-evident" harms—that is, ostensible harms requiring no additional argument from an agency apart from the justification for invoking an exemption or privilege—would render the statutory text meaningless. *See Black Hills Clean Water All. v. U.S. Forest Serv.*, No. 20-5034, 2022 WL 2340440, at *12 (D.S.D. June 29, 2022).  Courts must instead "give effect . . . to every clause and word of a statute."

*Ibrahim v. Dep't of State*, 311 F. Supp. 3d 134, 140 (D.D.C. 2018) (internal citation omitted). Indeed, "one of the most basic interpretive canons" is "that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (cleaned up).  The plain meaning of the foreseeable-harm standard reveals Congress's intent to require more of an agency.

The caselaw in this jurisdiction bears that out.  The D.C. Circuit has ruled the foreseeable-harm standard imposes an "independent and meaningful burden on agencies" that requires they "articulate both the nature of the harm from release and the link between the specific harm and specific information contained in the material withheld." *Reporters Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 369 (D.C. Cir. 2021) [hereinafter "*Reporters Comm. I*"] (internal brackets and citations omitted).  "Agencies cannot rely on mere speculative or abstract fears," nor may they meet their burden with "generalized assertions." *Id.* (cleaned up); *see Machado Amadis*, 971 F.3d at 371.  And as the district court has explained, "boiler plate language" will not hit the mark. *Judicial Watch, Inc.*, 375 F. Supp. 3d at 100 ("[G]eneral explanations of the possibility of a 'chilling effect' fall short of articulating 'a link between the specified harm and specific information contained in the material withheld.'").

An agency's foreseeable-harm analysis will inevitably be "context-specific." *Rosenberg v. Dep't of Def.*, 442 F. Supp. 3d 240, 259 (D.D.C. 2020).  But in all cases the agency must attend to the content of the record at issue and the underlying agency action, whether it is a deliberative process or the solicitation and provision of legal advice. *See Reporters Comm. I*, 3 F.4th at 370; *Machado Amadis*, 971 F.3d at 371.  CMS tries to muddy the waters on this point by selectively quoting and characterizing part of the D.C. Circuit's decision in *Reporters Committee I, see* Def.'s Br. at 4–5, and suggesting "context" refers not to the particulars of a given record but the broader

policy grounds for treating it as privileged.  *See, e.g.*, *id.* at 4 (some withholdings are "so obviously sensitive" as to negate the need for further showing).  But the *Reporters Committee I* court clarified that "context" refers both to the "agency action at issue," 3 F.4th at 370; *see id.* at 372 ("very context and purpose" of communications), *and* the subject-matter and content of the records in question.  *See id.* ("[T]he sensitivity of the context in which these conversations arose as well as their subject matter, and the need for confidentiality in discussions of undercover tactics, together provide the particularized context for a finding of foreseeable harm[.]").  The court also held that agencies must "concretely explain how disclosure 'would'—not 'could'"—lead to harm.  *Id.* at 369–70 (citing *Machado Amadis*, 971 F.3d at 371).[2]  Other courts have rejected CMS's interpretation, too.  *See, e.g.*, *Keeping Gov't Beholden, Inc. v. Dep't of Justice*, No. 17-1569, 2021 WL 5918627, at *8 n.6 (D.D.C. Dec. 13, 2021) (explaining "context" refers not to the particular privilege invoked but the "withheld information" and agency processes).

## II.     With the attorney-client privilege, an agency must show real and foreseeable harm unique from its satisfaction of the technical prerequisites for use of the privilege.

"[S]uccessful invocation of a FOIA exemption cannot justify [an agency's] withholding of exempt material without a more particularized inquiry into what sort of foreseeable harm would result from the material's release."  *Reporters Comm. I*, 3 F.4th at 370 n.2; *see Judicial Watch, Inc.*, 375 F. Supp. 3d at 100.  Although there is no controlling precedent detailing what this means in the context of the attorney-client privilege, there is little basis to support CMS's notion of "self-evident" harm that bypasses an agency's heightened burden for withholding.  The FOIA requires an agency at least to examine the "content of a particular record" and determine whether "disclosing that particular document" would cause harm, "given its age, content, and character."

---

[2] Although *Reporters Committee I* dealt with the deliberative-process privilege, there is no reason why the "would" vs. "could" standard should not apply with other privileges.

S. Rep. No. 114-4 at 8.  With the attorney-client privilege, this analysis includes consideration of whether release of the specific record at issue would—not could—interfere with the solicitation and provision of the same kind of legal advice in the same factual context.

### A.    An agency's claim of "self-evident" harm, absent more detailed analysis, cannot satisfy the foreseeable-harm standard.

CMS's central claim is that "[b]ecause the harm that breach of the attorney-client privilege causes is *self-evident*, an agency typically needs to show *little* to satisfy the foreseeable harm requirement."  Def.'s Br. at 3 (emphasis added).[3]  CMS appeals instead to abstract harms, such as "exposing communications made under an understanding of attorney-client confidentiality" and "chilling agency officials from seeking, and agency attorneys from providing, legal advice[.]"  *Id.* But something more is needed.  An "agency's allegation that . . . [a record], if disclosed, would reveal confidential, privileged material does nothing more than bring that information within the gambit of the attorney-client privilege" in the first instance.  *Black Hills Clean Water All.*, 2022 WL 2340440, at *12.  To countenance CMS's conclusory reference to confidentiality as such, would "nullify FOIA's additional requirement that an agency must show it reasonably foresees harm . . . if the record[] [were] disclosed."  *Id.*

Long-standing guidance issued by OIP confirms that the concept of "self-evident" harm finds no place under the FOIA.  *See* Dep't of Justice, OIP Guidance: Applying the "Foreseeable Harm" Standard Under Exemption 5, FOIA Update, vol. XV, no. 2 (Jan. 1, 1994) [hereinafter

---

[3] The attorney-client privilege covers "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice."  *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977).  The privilege is "not limited to communications made in the context of litigation or even a specific dispute," but it must reflect a client's request for "counsel . . . on a legal matter."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980).  The privilege "must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle[.]'"  *In re Lindsey*, 148 F.3d 1100, 1108 (D.C. Cir. 1998) (citation omitted).

"OIP Guidance"], *available at* https://bit.ly/3iDJhSi.  Although that guidance predates the 2016 FOIA Amendments, it has been used by the district court to review foreseeable-harm determinations under 5 U.S.C. § 552(a)(8).  *E.g.*, *Rosenberg*, 442 F. Supp. 3d at 260 n.7 ("[D]epending on the circumstances, some or all of these factors [in the OIP Guidance] may be relevant in making the context-specific determination that the release of withheld information is likely to cause harm to an exemption-protected interest.").  The district court has also recognized that Congress expected factors such as those set out in the OIP Guidance—including the "age, content, and character" of a "particular document"—to play a role in an agency's foreseeable-harm analysis.  *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 105 (D.D.C. 2019) (citing S. Rep. No. 114-4 at 8).

The OIP Guidance instructs "agencies . . . [to] consider making liberal waivers of the attorney-client privilege under the FOIA . . . through rigorous application of the 'foreseeable harm' elements" relevant to the attorney-work-product and deliberative-process privileges.  *See* OIP Guidance.  These "elements" include, among other things, the following types of considerations:

- Is "related litigation" ongoing or "sufficiently past [such] that the sensitivity of even the core information" covered by the privilege "has faded"?  Or is relevant agency action ongoing?
- "[D]oes the information [in the record] . . . remain sensitive due to its connection to similar or recurring litigation"?
- Can factual content be released or is the record "inherently sensitive"?
- Does the record reflect controversial or "highly sensitive" matters?
- Are the personnel involved in creation of the record likely to be affected by disclosure?
- Is any "'chilling effect' . . . so minimal as to be practically negligible"?
- Has "sensitivity of [the] information [in the record] fade[d] with the passage of time"?

*Id.*  That OIP has directed agencies to consider these factors and others as part of their foreseeable-harm analyses—*in the context of the attorney-client privilege*—severely undercuts CMS's claim that foreseeable harm can ever be "self-evident" simply because a record is privileged.

10

Developments in Exemption 4 caselaw are instructive.  Following the Supreme Court's decision in *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019), it was an open question whether the foreseeable-harm standard required any showing beyond the technical requirements for Exemption 4, at least as far as confidential commercial or financial information was concerned.  Put another way, there was disagreement about the nature of the interest protected by the exemption.  At least one court has asserted that the relevant interest is confidentiality *qua* confidentiality.  On this view, "[d]isclosure would necessarily destroy the private nature of the information, no matter the circumstance"—a sort of "self-evident" harm.  *Am. Small Bus. League v. Dep't of Def.*, 411 F. Supp. 3d 824, 836 (N.D. Cal. 2019).  Most courts, however, have taken the opposite view and rejected the notion that disclosure in-and-of-itself could pose a cognizable harm without some further demonstration of how release would cause "genuine harm to [a submitter's] economic or business interests[.]"  *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 113; *see Ctr. for Investigative Reporting v. Dep't of Labor*, 424 F. Supp. 3d 771, 780 (N.D. Cal. 2019).  The Second Circuit has joined the trend and explained that both the "structure" of the FOIA and "common sense" cut against claims of harm that turn on the technical application of an exemption: "Congress expressly enacted the [2016 FOIA Amendments] to address situations where information would fall within an exemption and yet no harm would result from disclosure[.]"  *Seife v. Food & Drug Admin.*, 43 F.4th 231, 241 (2d Cir. 2022).  CMS's foreseeable-harm argument in the context of Exemption 5 and the attorney-client privilege is analogous to the position most courts are rejecting with Exemption 4.

**B.    CMS's arguments in support of "self-evident" harm are unavailing.**

CMS offers a series of arguments for why "self-evident" harm is sufficient under the foreseeable-harm standard.  But each of these is divorced from the statutory text and FOIA

11

jurisprudence more broadly.  Congress has spoken: The foreseeable-harm standard imposes an added burden on agencies to withhold documents under a discretionary exemption, no matter the attendant privilege.  Mere recitation of the policy concerns underlying an exemption cannot, by itself, satisfy that burden.

*First*, CMS argues the "'centrality of open client and attorney communication' . . . makes obvious the harm that results from breach of the privilege."  Def.'s Br. at 5 (citation omitted).  This is a type of "chill" argument as it implies robust application of the foreseeable-harm standard will dissuade agency employees from "'full and frank communication' with their attorneys[.]"  *Id.* at 6 (citation omitted).  Yet such an argument is misplaced.  Not only are nebulous claims of "chill" generally suspect, *see Judicial Watch, Inc.*, 375 F. Supp. 3d at 101; *see also Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 107–08, but the notion that faithful application of the foreseeable-harm standard could dissuade agency personnel from seeking legal counsel is hyperbole.  Those who solicit and provide "legal advice" within the government "are surely sophisticated enough to know that" Exemption 5 is discretionary and the "attorney/client . . . privilege[] can be [effectively] waived[.]"  *N.Y. Times Co. v. Dep't of Justice*, 756 F.3d 100, 116–17 (2d. Cir. 2014).  This is particularly evident in the FOIA context.  *See infra* at pg. 13–14.  There is no serious reason to fear an Office of General Counsel will "lack for clients."  *N.Y. Times Co.*, 756 F.3d at 117.  To the extent "chill" should be considered at all, it requires something more than boilerplate or conclusory claims on the part of an agency.  *See Judicial Watch, Inc.*, 375 F. Supp. 3d at 101 ("The question is not whether disclosure could chill speech, but rather if it is reasonably foreseeable that it will chill speech, and if so, what is the link between this harm and the specific information contained in the material withheld.");  *Machado Amadis*, 971 F.3d at 371.

*Second*, CMS protests the attorney-client privilege enjoys an "ancient lineage," whereas the "deliberative-process privilege, in contrast, lacks comparably deep roots in our law[.]"  Def.'s Br. at 6.  This distinction is irrelevant and confuses the question before the Court.  The attorney-client privilege is foundational, to be sure, but it plays a different role under the FOIA as compared to civil litigation.  The Supreme Court has recognized that FOIA exemptions are discretionary, not mandatory, *Chrysler Corp. v. Brown*, 441 U.S. 281, 293 (1979) ("Congress did not design the FOIA exemptions to be mandatory bars to disclosure."), and it has described the "privileges" used alongside Exemption 5 as "rough analogies" to the privileges when applied in civil discovery. *Envtl. Prot. Agency v. Mink*, 410 U.S. 74, 86 (1973); *cf. North v. Walsh*, 881 F.2d 1088, 1099 (D.C. Cir. 1989) ("[A]n individual may . . . obtain under FOIA information . . . even when the documents could not be obtained through discovery.").  In any case, the FOIA does not distinguish between privileges for the purposes of the foreseeable-harm standard, let alone Exemption 5.  *See* 5 U.S.C. § 552(b)(5) ("inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency").  It would be improper to read into the statute any special treatment for the attorney-client privilege when the text cannot sustain it.  *See Lewis v. City of Chicago*, 560 U.S. 205, 217 (2010) ("Our charge is to give effect to the law Congress enacted.").

The attorney-client relationship in the private sphere also differs from the same relationship within the government.  "[G]overnment lawyers have responsibilities and obligations different from those facing members of the private bar.  While the latter are appropriately concerned first and foremost with protecting their clients . . . , government lawyers have a higher, competing duty to act in the public interest."  *In re Witness Before Special Grand Jury 2000-2*, 288 F.3d 289, 293 (7th Cir. 2002).  The interest in treating attorney-client confidentiality as sacrosanct in civil

discovery does not translate directly to the FOIA context, precisely because the statute *requires* disclosure and *requires* two distinct justifications for withholding—*viz.*, the technical basis for use of an exemption and a demonstration of foreseeable harm.  Agency records ultimately belong to the People, not unelected bureaucrats.

*Third*, and somewhat relatedly, CMS's argument about the difference between qualified and unqualified privileges is neither here nor there.  *See* Def.'s Br. at 6–7.  Again, the privileges recognized in civil litigation are only applied as "rough analogies" in the FOIA context.  *See Mink*, 410 U.S. at 86.  To that end, the Supreme Court has repeatedly held the key question for purposes of Exemption 5 is whether information is "routinely" privileged.  *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799 (1985); *see Fed. Trade Comm'n v. Grolier, Inc.*, 462 U.S. 19, 20 (1983).  The foreseeable-harm standard—and the extra burden it imposes to sustain a withholding—is analytically distinct from the requirement that an agency show the attorney-client privilege "routinely" applies to certain records requested under the FOIA.  The fact OIP has long advised agencies to consider the same foreseeable-harm factors for the attorney-client privilege as the attorney-work-product and deliberative-process privileges—both *qualified privileges*—buttresses this view.  *See* OIP Guidance ("It will do little good for an agency to pursue discretionary waiver of its attorney-work product privilege . . . if it does not waive any applicable attorney-client privilege in like fashion."); *id.* ("[T]he very same strong policy considerations that can compel discretionary disclosure in relation to the deliberative process privilege . . . compel likewise insofar as [the attorney-client privilege] overlaps[.]").

*Fourth*, CMS claims "'Congress was particularly concerned with . . . the deliberative process privilege'" when it passed the 2016 FOIA Amendments and, by implication, it did not intend to impose any special burden on agencies vis-à-vis the attorney-client privilege.  Def.'s Br.

at 7.  CMS specifically points to Congress's decision to limit the 25-year "sunset" provision to the deliberative-process privilege instead of all Exemption 5 privileges, as originally proposed.  *Id.* at 7–8.  The agency suggests this drafting change somehow lessens the force of the foreseeable-harm standard overall.  Not so.

Although Congress expressed especial concern with remedying agencies' overreliance on the deliberative-process privilege, the overarching purpose of the 2016 FOIA Amendments was to prevent the improper use of *all* discretionary exemptions.  *See Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 104; S. Rep. No. 114-4 at 2–3; H.R. Rep. No. 114-391 at 9.  The D.C. Circuit has explained as much: "Congress adopted the FOIA Improvement Act in part out of 'concerns that some agencies were overusing FOIA exemptions that allow, but do not require, information to be withheld from disclosure.'"  *Reporters Comm. I*, 3 F.4th at 369 (internal brackets and citation omitted).  Those concerns extended to Exemption 5 and the attorney-client privilege.  More importantly, Exemption 5's "sunset" provision does *not* affect the foreseeable-harm standard. Whereas the former is a categorical ban on the use of the deliberative-process privilege after twenty-five years, the latter requires another justification for withholding *above and beyond* the technical grounds for a privilege.  Congress wanted the foreseeable-harm standard to apply to *all* discretionary exemptions—including Exemption 5 when used with "legal privileges," such as the attorney-client privilege.  H.R. Rep. 114-391 at 9.

CMS's use of legislative history is unhelpful.  *See* Def.'s Br. at 7–8.  Setting aside the fact the "sunset" provision and foreseeable-harm standard are found in separate sections of the FOIA and apply at different stages of justifying a withholding, *cf.* 5 U.S.C. § 552(a)(8)(A)(i) *with id.* § 552(b)(5), the Supreme Court has refused to consider the elimination of language from a draft bill as a "reliable indicator[] of congressional intent."  *Mead Corp. v. Tilley*, 490 U.S. 714, 723

15

(1989). "A bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001). CMS's own authorities support this proposition. *See Gen. Accounting Office v. Gen. Accounting Office Pers. Appeals Bd.*, 698 F.2d 516, 525 n.52 (D.C. Cir. 1983) ("We recognize that rejection of proposed legislation during the course of enactment provides a hazardous basis from which to determine legislative intent[.]"); *see also Houston Lighting & Power Co. v. United States*, 606 F.2d 1131, 1139 (D.C. Cir. 1979) (finding changes to a proposed bill only useful when referenced with the legislative history). Contrary to the CMS's suggestion, the legislative history for the 2016 FOIA Amendments contains explicit evidence of Congress's desired construction of the final version of the "sunset" provision:

> [T]he deliberative process privilege sunset is not intended to create an inference that the other privileges—including attorney-client and attorney work product, just to name a few—are somehow heightened in strength or scope because they lack a statutory sunset or that we believe they should not be released after 25 years. Courts should not read the absence of a sunset for these other privileges as Congress's intent to strengthen or expand them in any way.

162 Cong. Rec. S1496 (daily ed. Mar. 15, 2016) (statement of Sen. Leahy).

### C.  The caselaw cited by CMS is inapt or distinguishable.

Finally, CMS claims that "every judge in this District to consider the question has concluded that an agency's burden to show foreseeable harm is relatively low in the attorney-client privilege context[.]" Def.'s Br. at 8. Yet only a handful of decisions in the district court have addressed the interplay of the foreseeable-harm standard and the attorney-client privilege, and neither the Supreme Court nor the D.C. Circuit have issued authoritative decisions. In fact, the published district court cases largely omit any detailed consideration of the issue and none of them straightforwardly endorses CMS's view that harm can be "self-evident," rather than contextual and necessarily analyzed under multiple factors. CMS's authorities are therefore either inapt or

distinguishable.[4]  If they have any relevance at all, their usefulness depends on their persuasive force.  *See, e.g.*, *Jewish War Veterans of the U.S., Inc. v. Mattis*, 266 F. Supp. 3d 248, 253 (D.C. Cir. 2017) ("[A] district court opinion . . . is not binding on any court beyond its use in [that] case, and . . . is only valuable as persuasive authority.").

The earliest district court case offered by CMS is *Ecological Rights Foundation v. Environmental Protection Agency*, in which Chief Judge Howell surmised that, "[w]hen invoking the attorney-client privilege . . . an agency likely does not need to reach far beyond the fact of disclosure to show foreseeable harm."  No. 19-0980, 2021 WL 535725, at *32 (D.D.C. Feb. 13, 2021), *vacated in part*, 541 F. Supp. 3d 34 (D.D.C. 2021).  But this is pure obiter dictum.  *Cf. United States v. Sullivan*, 116 F. Supp. 480, 484 (D.C. Cir. 1953) ("[A]s has been frequently held both by the Supreme Court and by the Court of Appeals, a dictum should not be regarded as a ruling.").  *Ecological Rights Foundation* did not involve records withheld under the attorney-client privilege, and its foreseeable-harm analysis substantively grappled only with the deliberative-process privilege.  *See* 2021 WL 535725, at *12–13.

Other decisions cited by CMS either indirectly address—or altogether fail to address—the foreseeable-harm standard, or they provided conclusory analysis of why an agency satisfied its burden to justify non-disclosure.  These cases are unpersuasive.  *Cf. Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 172 F. Supp. 2d 138, 153 (D.D.C. 2001) (rejecting "conclusory" district court reasoning that lacks any citation to precedential sources), *rev'd on other grounds*, 295 F.3d

---

[4] CMS's reliance on *Louise Trauma Center LLC v. Department of Homeland Security*, No. 20-1128, 2022 WL 1081097 (D.D.C. Apr. 4, 2022), and *Selgjekaj v. Executive Office for U.S. Attorneys*, No. 20-2145, 2021 WL 3472437 (D.D.C. Aug. 6, 2021), is not so compelling as both involved the attorney-work-product privilege.  *See* Def.'s Br. at 9 n.4.  AFPF's criticism of CMS's other authorities applies equally to these cases.  *See infra* at pp. 16–20.  Neither case seriously grapples with arguments about the force of the foreseeable-harm standard, especially considering the legislative history and the OIP Guidance.  *See, e.g.*, *supra* at pp. 8–11.

28 (D.C. Cir. 2002).  In *Cabezas v. Federal Bureau of Investigation*, for example, the district court only considered the foreseeable-harm standard as it applied to the deliberative-process privilege; the court omitted application of the standard to the attorney-client privilege.  No. 19-0145, 2022 WL 898789, at *7–8 (D.D.C. Mar. 28, 2022).  Although *Cabezas* made a passing reference to how disclosure might "'disrupt the adversarial process,'" that statement seemingly concerned the agency's satisfaction of the prerequisites for use of the privilege.  *Id.* at *8 (citation omitted).

The single sentence in *Avila v. Department of State* that CMS quotes is similarly conclusory.  *See* Def.'s Br. at 9.  The *Avila* court did not address either of the party's substantive arguments or the relevant record evidence.  No. 17-2685, 2022 WL 2104483, at *12 (D.D.C. June 10, 2022).  The same goes for *Cayuga Nation v. Department of the Interior*.  Without any discussion of the evidentiary record or the parties' legal arguments, Judge Jackson stated that "harm is apparent" and cited the dictum in *Ecological Rights Foundation* as support for her holding.  *Cayuga Nation*, No. 20-2642, 2022 WL 888178, at *9 (D.D.C. Mar. 25, 2022).

CMS tries to make much hay of this Court's prior decisions in *Tobias v. Department of the Interior* and *American Civil Liberties Union v. Central Intelligence Agency*.  Each of these cases arguably lacks detailed consideration of how the foreseeable-harm standard should be applied to records withheld under the attorney-client privilege.  At the same time, they are marked by their actual engagement with the evidentiary record—the sort of record the Court does not have the benefit of here.  In *American Civil Liberties Union*, for example, the Court not only conducted *in camera* review, No. 18-2784, 2022 WL 306360, at *11 (D.D.C. Feb. 2, 2022), but it found the agency's declarations—and especially the second supplemental declaration filed at the Court's recommendation in the wake of the D.C. Circuit's decision in *Reporters Committee I*—to provide a more robust explanation for how disclosure of the specific records at issue (*i.e.*, communications

about the Senate nomination process) could harm the same underlying agency action in the future. *See, e.g.*, 2d Suppl. Decl. of Vanna Blaine ¶ 13, *Am. Civil Liberties Union v. Cent. Intelligence Agency*, No. 18-2784 (D.D.C. filed Aug. 24, 2021), ECF No. 40-1.  Unlike CMS, the CIA did not offer arguments based on "self-evident" harm.  Similar details are decidedly lacking in CMS's argument.  *See* Decl. of Hugh Gilmore ¶¶ 10–13, ECF No. 24-3; *see also infra* at pp. 20–23.[5]

The final case CMS cites does not really cut in the agency's favor.  In *Reporters Committee for Freedom of the Press v. Customs & Border Protection*, Judge McFadden cautiously explained "an agency's burden . . . *may* be more easily met when invoking other privileges and exemptions for which the risk of harm through disclosure is more self-evident and the potential for agency overuse is attenuated."  567 F. Supp. 3d 97, 120 (D.D.C. 2021) [hereinafter "*Reporters Comm. II*"] (emphasis added).  Thus, at least as far as records related to litigation with Twitter and the defendant-agency's "19 U.S.C. § 1509 summons authority" were concerned, the court acknowledged the government's argument was "overwrought" but still provided enough detail to show risk of real harm.  *Id.* at 117.

By itself, this portion of the *Reporters Committee II* decision—particularly when divorced from the evidentiary record—is easily misread in a superficial way to render the foreseeable-harm standard surplusage, as CMS effectively suggests.  *See* Def.'s Br. at 8 & 10.  Read out of context, Judge McFadden's passing statement that "the law already acknowledges and guards against the risk of harm that would come from disclosing attorney-client communications," as far as it sustains the technical application of the privilege, could be understood to ignore the extra burden on non-

---

[5] In *Tobias*, this Court found that the Department of the Interior had filed an adequately detailed declaration and *Vaughn* index.  No. 18-1368, 2021 WL 4262488, at *2 (D.D.C. Sep't 20, 2021).  Even if the Court reached the correct decision about the foreseeable-harm standard, similar specificity is not in the Gilmore Declaration.  *See infra* at pp. 20–23.

disclosure required by the foreseeable-harm standard.  But courts must "avoid . . . reading [a statute in way] that renders some words altogether redundant."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176–77 (2012); *see United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.") (cleaned up and citation omitted).

The proper reading of *Reporters Committee II* becomes apparent after turning to the court's consideration of foreseeable harm and the attorney-client privilege as applied to another category of records that CMS does not mention in its brief—namely, email about the processing of the plaintiff's FOIA requests.  567 F. Supp. 3d at 122–25.  With those records, Judge McFadden clarified that, while "establishing the attorney-client privilege will go a long way to show the risk of foreseeable harm," the "agency must still provide a non-generalized explanation" of the harm "that would result from disclosure[.]" *Id.* at 124.  The court thus rejected the agency's "conclusory statement" that "disclosure would 'undermine the attorney-client privilege.'" *Id.*  Indeed, the dearth of explanation about the harm of releasing the *specific content of the email* compelled the court to admit "the risk of disclosure [was not] 'manifest' on the record." *Id.* ("CBP has barely provided any explanation at all."); *see id.* at 124 n.8 (rejected foreseeable-harm arguments were "distinguish[able] . . . from [the] Category 5 [arguments], which at least provided some explanation for why the attorney-client communications would be harmed by disclosure.").  CMS cannot seriously maintain that *Reporters Committee II* supports its claim of "self-evident" harm.

## III.  CMS has not satisfied its burden under the foreseeable-harm standard to withhold the record at issue.

CMS's arguments for why much of the September 1990 memorandum should be withheld are deficient.  The agency has offered only two boilerplate assertions for why disclosure is likely

to harm an interest protected by the attorney-client privilege.  And the agency altogether disregards other important factors relevant to the foreseeable-harm inquiry.

*First*, CMS claims "these materials 'were communicated under an understanding that they would remain confidential . . .' [and] their disclosure would harm interests that the attorney-client privilege protects in and of itself."  Def.'s Br. at 10–11 (citations omitted); *see* Gilmore Decl. ¶ 11 ("This information is considered confidential, and CMS has not waived the attorney-client privilege."); *see also* Gilmore Decl. ¶ 12 ("The withheld materials were communicated under an understanding that they would remain confidential[.]").  But this appeal to "self-evident" harm parrots the technical prerequisites for invoking privilege in the first place.  *See Black Hills Clean Water All.*, 2022 WL 2340440, at *12 (An "agency's allegation that . . . [a record], if disclosed, would reveal confidential, privileged material does nothing more than bring that information within the gambit of the attorney-client privilege[.]").  That is not enough.  CMS "must still provide a non-generalized explanation" of harm beyond stating "disclosure would 'undermine the attorney-client privilege.'"  *Reporters Comm. II*, 567 F. Supp. 3d at 124; *cf. Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 79 (D.D.C. 2018) ("government must do more than perfunctorily state that disclosure" will result in harm).

*Second*, CMS suggests "disclosing the withheld materials would chill [its] officials and attorneys from seeking or providing legal advice[.]"  Def.'s Br. at 11.  This line of argument also comes up short.  CMS's declarant speaks in generalities and never ties the threat of "chill" to concrete ongoing or future agency action.  *See* Gilmore Decl. ¶¶ 10, 11 ("[A]gency officials would be discouraged from seeking, and thus less likely to seek, legal review and advice[.]"), 13.  Mr. Gilmore fails to engage with the content of the September 1990 memorandum or the nature of the agency decision-making implicated in the solicitation and provision of legal advice.  He also fails

to explain why disclosure would harm the same processes now or later. *See Reporters Comm. I*, 3 F.4th at 372 (agency must "directly articulate[] a link between the specified harm" and the "specific information contained in the material withheld"); *see also Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106 (agency must connect a harm in a "meaningful way to the information withheld"). Given Mr. Gilmore's "vague description" of the "substantive legal discussions" implicated in the September 1990 memorandum, it would strain credulity to conclude harm is "'manifest on the record.'" *Reporters Comm. II*, 567 F. Supp. 3d at 124. Any "'chilling effect' . . . [is] so minimal as to be practically negligible[.]" OIP Guidance.

Perhaps CMS "could have made th[e] risk" of disclosure "clear if it had provided an explanation beyond the five words 'would undermine the attorney-client privilege," but it has failed to do so. *Reporters Comm. II*, 567 F. Supp. 3d at 124; *see Black Hills Clean Water All.*, 2022 WL 2340440, at *12 (conclusory reference to breach of confidentiality or generic "chilling" would "nullify FOIA's additional requirement that an agency must show it reasonably foresees harm . . . if the records are disclosed"). Even then, it is doubtful CMS could meet its burden, especially considering the factors OIP has instructed agencies to consider under the foreseeable-harm standard. *See generally* OIP Guidance.[6]

The September 1990 memorandum is over thirty years old, Pl.'s SUMF ¶ 22, and it concerns facts and legal reasoning that are roughly forty years old. Pl.'s SUMF ¶¶ 23–24. Presumably there is no ongoing agency action that relates to state government disallowance liability for Fiscal Year 1982, and in any case, CMS has not explained how its draft memorandum and letter remain inherently sensitive given the "passage of time." OIP Guidance; *see Ctr. for*

---

[6] For example, the OIP Guidance asks, "Are the same agency employees, or other employees who are similarly situated, likely to be affected by the disclosure?" OIP Guidance. Here, it appears there is no one left at the agency to be affected by disclosure of this record. Pl.'s SUMF ¶ 28.

*Investigative Reporting*, 436 F. Supp. 3d at 107 ("[I]t will not be 'axiomatic' . . . that disclosure will cause the harms that the defendants claim" because the relevant agency action at issue has concluded).[7]   CMS even admits its ignorance of the consultations that gave rise to the September 1990 memorandum, as there is no one currently employed in the relevant program office who knows about the underlying events.  Pl.'s SUMF ¶ 28.

CMS's position is overwrought.  The likelihood of harm arising from disclosure of a three-decades-old memorandum is less than minimal and not reasonably foreseeable.  CMS personnel will continue to seek advice from agency attorneys, and the Department of Health and Human Services' Office of the General Counsel will continue to provide it.  The question before the Court is an easy one.  The added burden of justifying non-disclosure under the foreseeable-harm standard is meaningful, and it is not met with specious claims of "self-evident" harm.

## IV.  The Court should consider conducting *in camera* review.

The FOIA authorizes a district court to conduct *in camera* inspection of any record to determine whether it should be withheld.  5 U.S.C. § 552(a)(4)(B).  Based on the arguments presented above, it would be appropriate for the Court to conduct an *ex parte*, *in camera* inspection of the September 1990 memorandum and its attachments to independently evaluate whether disclosure would harm an interest protected by Exemption 5.  *See Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) ("[D]istrict courts have 'broad discretion' to decide whether *in camera* review is necessary to determine whether the government has met its burden[.]").

*In camera* review is appropriate in this case because CMS has failed to adequately identify any non-generalized foreseeable harm in disclosure.  *See supra* at pp. 20–23; *see also Spirko v.*

---

[7] Again, it is worth noting CMS initially withheld the September 1990 memorandum under the deliberative-process privilege but changed its position after AFPF clarified this would be barred by Exemption 5's "sunset" provision.  *See* Pl.'s SUMF ¶¶ 25–27; Mulvey Decl. ¶¶ 26–28.

*U.S. Postal Serv.*, 147 F.3d 992, 997 (D.C. Cir. 1998) ("If the agency fails to provide a sufficiently detailed explanation to enable the district court to make a de novo determination . . . the district court then has several options, including inspecting the documents *in camera*[.]"); *Quiñon v. Fed. Bureau of Investigation*, 86 F.3d 1222, 1229 (D.C. Cir. 1996) ("[If] an agency's affidavits merely state in conclusory terms that documents are exempt . . . *in camera* review is necessary.").

 *In camera* review would not be onerous. *See Quiñon*, 86 F.3d at 1228 (how many records to be inspected is "another . . . factor to be considered" when determining whether *in camera* review is appropriate); *see also People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 307 (D.D.C. 2007) ("*In camera* review may be appropriate when . . . 'the number of records involved is relatively small[.]") (citation omitted). There is only a single seven-page record at issue, and AFPF has provided the Court with a redacted copy. *See* Mulvey Decl. Ex. 3. If anything, *in camera* review would serve judicial economy. *See Carter v. Dep't of Commerce*, 830 F.2d 388, 393 (D.C. Cir. 1987) ("[W]hen the requested documents 'are few in number and of short length,' *in camera* review may save time and money."). *In camera review* has been used by this Court and others when considering an agency's claim that the attorney-client privilege applies and the foreseeable-harm standard satisfied, too. *See Am. Civil Liberties Union*, 2022 WL 306360, at *11; *see also Cayuga Nation*, 2022 WL 888178, at *9.

 The Court should therefore consider ordering CMS to submit an unredacted version of the record at issue for the Court's consideration.

//

//

24

**CONCLUSION**

For these reasons, AFPF requests that the Court deny CMS's motion for summary judgment and grant AFPF's cross-motion for summary judgment.  AFPF further requests that the Court order CMS to re-process and produce the responsive record at issue in its entirety within the next twenty days.

Dated: December 13, 2022                    Respectfully submitted,

                                            */s/ Ryan P. Mulvey*
                                            Ryan P. Mulvey
                                            D.C. Bar No. 1024362
                                            Eric R. Bolinder
                                            D.C. Bar No. 1028335

                                            AMERICANS FOR PROSPERITY
                                            FOUNDATION
                                            1310 North Courthouse Road, Suite 700
                                            Arlington, VA 22201
                                            Telephone: (571) 444-2841
                                            rmulvey@afphq.org
                                            ebolinder@afphq.org

                                            *Counsel for Plaintiff*